Andrew M. Calamari
Lara S. Mehraban
Alexander Vasilescu
Adam S. Grace
Brenda Wai Ming Chang
John Lehmann
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Room 400
New York, NY 10281
(212) 336-0178 (Vasilescu)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　Plaintiff,　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　16 Civ. 06606 (　)
　　　　　-against-　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　**COMPLAINT**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
HARRISON KATZEN,　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　Defendant.　　　　　　　　　　　　　　　　　　　　:
------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Harrison Katzen ("Defendant" or "Katzen"), alleges:

### SUMMARY

1.　　This action arises out of Defendant's participation in fraudulent schemes to offer and sell sham securities to the investing public. These schemes raised approximately $3.2 million in illegal proceeds from approximately 60 investors in the United States and overseas. Other scheme participants included International Stock Transfer, Inc. ("IST"), a registered transfer agent; Cecil Franklin Speight ("Speight"), IST's president and sole owner; and attorneys James L. Schmidt, II ("Schmidt") and Jonathan P. Flom ("Flom") – each of whom were

previously charged by the Commission for their roles in these schemes (*SEC v. International Stock Transfer, Inc. et al.*, 14-CV-4435 (ADS) (E.D.N.Y. July 2014); *SEC v. Schmidt*, 14-CV-5574 (WFK) (E.D.N.Y. September 2014); and *SEC v. Flom*, 14-CV-5575 (SLT) (E.D.N.Y. September 2014).

2. The schemes entailed offering and selling sham securities through a web of phony websites, internet advertisement, and an aggressive cold calling campaign – all of which, operating under the guise of seemingly legitimate investment firms, promised investors low risk and high rates of return. At the direction of Speight, Katzen prepared offering materials touting the purported issuers and the safety and benefits of investing in their securities and containing materially false and misleading statements. Investors who purchased the securities received only counterfeit certificates not worth the paper they were printed on.

3. None of the investor funds was remitted to the purported issuers of these securities. Instead, despite representations in the offering materials that the offering proceeds would be used by issuers, investor money was funneled into IST's bank account and thereafter spent almost as quickly as it came in with the lion's share distributed among scheme participants and spent on funding the ongoing schemes. Some proceeds were also transferred from IST's bank account into another corporate bank account over which Katzen and Speight shared signatory authority. In addition, in Ponzi-scheme-like fashion, some investor monies were used to make phony "interest payments" to other earlier investors.

## VIOLATIONS

4. By virtue of the conduct alleged herein Katzen, directly or indirectly, singly or in concert, has engaged and is engaging in acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a),

2

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), seeking to permanently restrain and enjoin Defendant from engaging in the acts, practices, and courses of business alleged herein.

6. The Commission seeks a Final Judgment ordering Defendant to disgorge ill-gotten gains and to pay prejudgment interest thereon, ordering Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), prohibiting Defendant from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and imposing on Defendant an officer and director bar pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The Defendant, directly and indirectly, has made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein, including by the offer and sale and the mailing of securities to residents in this District.

## DEFENDANT

9. **Katzen**, age 34, is a resident of Lantana, Florida. He earned a BS and a MBA degree, and previously held Series 7 and 63 FINRA licenses. Katzen was employed and compensated by Speight on a part-time basis intermittently in 2010, then on a full-time basis by IST in or around May 2012 through at least April 2013. Katzen was listed as an officer and director of Dunhill Investment Holdings, Inc. ("Dunhill").

## RELATED PERSONS AND ENTITIES

10. **IST** is a Florida corporation incorporated in 2004, formerly with an office in Palm Beach, Florida. Speight was the sole owner, officer, and director of IST. On March 22, 2004, IST registered with the Commission as a transfer agent. Following an examination of IST's business on June 14, 2013 by the staff of the Commission's Office of Compliance Inspections and Examinations, IST filed a Form TA-W with the Commission, seeking to withdraw its registration as a transfer agent. The withdrawal was made effective on August 13, 2013.

11. **Speight**, age 56, was a resident of West Palm Beach, Florida. Speight was the sole owner, officer, and director of IST. He is presently incarcerated in FCI Sheridan in Sheridan, Oregon. On July 28, 2014, the Court entered a judgment on consent against Speight imposing an injunction against him and IST for securities law violations arising out of the conduct alleged in the complaint in the action captioned *SEC v. International Stock Transfer, Inc. et al.,* 14-CV-4435 (ADS) (E.D.N.Y.). Contemporaneously, Speight plead guilty to a related conspiracy to commit securities fraud charge in the parallel criminal action captioned *United States v. Speight*, 14-CR-379 (RRM) (E.D.N.Y.).

12. **Schmidt**, age 58, is an attorney licensed to practice in Florida. In September 2014, the Commission charged Schmidt with securities law violations arising out of the conduct

alleged in the complaint in the action captioned *SEC v. Schmidt,* 14-CV-5574 (WFK) (E.D.N.Y.). On February 25, 2016, Schmidt was found guilty by a jury of one count of money laundering arising out of charges in a related parallel criminal action. *United States v. Schmidt,* 14-CR-506 (RRM) (E.D.N.Y.).

13.     **Flom**, age 59, is an attorney licensed to practice in Florida, Connecticut, and New York. In September 2014, the Commission charged Flom with securities law violations arising out of the conduct alleged in the complaint in the action captioned *SEC v. Flom,* 14-CV-5575 (SLT) (E.D.N.Y.). On June 24, 2016, Flom was found guilty by a jury of one count of money laundering arising out of charges in a related parallel criminal action. *United States v. Flom,* 14-CR-507 (RRM) (E.D.N.Y.).

## FACTS

A.     **Overview of the Fraudulent Schemes**

14.     From at least 2012 to mid-2013, Speight conducted various securities offering schemes through his transfer agency, IST, to lure investors into purchasing fictitious (i) debt bonds purportedly issued by Altmark Holdings, Ltd. ("Altmark"), which promised 14% or 12.5% annual interest, depending on the specific bond issue, and (ii) equity stock purportedly issued by PDL Portfolio (XIX) Ltd. ("PDL"), which inexplicably promised a "fixed rate of 20%."

15.     Speight funded the creation of websites for bogus unregistered financial advisers, each claiming to employ teams of reputable financial specialists, who instead, peddled counterfeit securities to investors either by internet advertising or traditional "cold calling" (collectively "Cold Callers").

16.     Katzen had no direct contact with the Cold Callers; however, at Speight's direction, Katzen prepared the written offering materials the Cold Callers used to solicit interest

in the fake investments. The offering documents touted high rates of return to be paid by the issuers, backed by their purportedly substantial corporate assets and business operations. In addition to guaranteeing return of investors' principal, the offering documents represented that investor funds would be used by the issuers for various corporate purposes.

17. All of these representations were false and Katzen was at least reckless in disregarding facts that should have led him to understand they were false. In fact, Altmark had never authorized the public offer and sale of its securities, and PDL was actually a corporate shell with no assets or business operations, only recently formed by Speight.

18. The Cold Callers, who worked out of "boiler rooms," were ultimately compensated with exorbitantly high commissions from the scheme proceeds for offering and selling the securities to investors. Katzen was aware of the Cold Caller's compensation levels, and that the securities being offered could not possibly generate the touted returns for investors as well as pay the Cold Caller's undisclosed commissions.

19. To further enhance the offerings' appearance of legitimacy and, at the direction of Speight, Katzen created term sheets and PowerPoint "pitchbook" presentations (collectively "offering materials") that falsely identified IST as "Paying Agent" through which principal and interest payments would be made to investors, and identified Schmidt as "Bond & Tax Counsel" for the issuers. In reality, Schmidt along with Flom merely used their attorney escrow accounts as conduits through which all investor money – less the substantial fees kept by Schmidt and Flom – was transferred to IST and, from there, used in ways wholly inconsistent with the disclosures made in the offering documents.

20. Katzen prepared these offering materials at least recklessly disregarding that certain factual statements included therein were materially false and misleading.

6

21.     When Cold Callers succeeded in making a sale, they directed investors to wire their money to Schmidt or Flom's attorney escrow accounts, which obscured the fact that investor funds would not be delivered to the issuers, but instead, transferred into IST bank accounts.

22.     Once IST received the money, Speight through IST created and sent counterfeit paper securities certificates to the investors. Speight held himself out to be an officer or director of Altmark and PDL when he signed the certificates.

23.     As the scheme's continued success hinged on delivering the promised interest, Speight used some of the investor proceeds to fund fake "interest" payments to earlier investors.

24.     In Ponzi-scheme-like fashion, the so-called interest was funded by investor money from an IST bank account and anther bank account in the name of Dunhill. Speight served as Dunhill's President, while Katzen was listed as an officer and director of the company. Speight and Katzen shared signatory authority over Dunhill's bank account.

### IST and Speight's Offer and Sale of Sham Altmark Bonds

25.     Among the fake securities Speight and IST offered and sold to investors were corporate bonds purportedly issued by Altmark with a promised annual interest rate of 14% or 12.5% depending on the issue.

26.     Altmark is an actual issuer of securities, founded in Switzerland and headquartered in Turks & Caicos. In 2007, Altmark issued high-yield bonds that have been held in electronic form in various accounts of Depository Trust Company ("DTC") participants. During the relevant time period, however, Altmark did not make any interest or principal payments through DTC to any holders of the debt securities. Despite the bonds being listed on a German stock exchange, the market for Altmark bonds was highly illiquid throughout the

7

relevant time period.

27. Unbeknownst to potential investors, Speight incorporated another Altmark entity – formed in Belize and bearing the same issuer name – that he intended to use to sell bonds spoofing the "real" Altmark securities. Cold Callers promised investors that the Speight created Altmark bonds were low risk and would pay high rates of return.

28. From at least May 2012 through April 2013, IST created and mailed phony paper bond certificates to investors while purporting to be Altmark's transfer agent. Speight signed these certificates as a director of Altmark, even though he held no such position with "real" Altmark.

29. While the paper certificates created by Speight bore the Altmark name and a CUSIP number registered to an Altmark security, they contained a number of anomalies.[1] For instance, the back of the IST-issued certificates reflected Altmark as a Turks & Caicos company, but the front of the same certificates represented that Altmark was a Belize entity; the back of the certificates referenced Altmark as having collateral consisting of "treasuries," "blue chip stocks," and an "investment portfolio," which was different from the mineral reserves collateral purportedly underlying the real Altmark bonds; and, contrary to how transfer agents typically operate, IST issued bond certificates to investors bearing numbers that were not in chronological order.

30. The Cold Callers promised annual interest payments of 14% or 12.5% to investors. IST and Speight used approximately $94,000 of newly obtained investor monies to fund purported initial "interest" payments to earlier investors. Speight directed these "interest" payments to be made through an IST bank account, as well as the Dunhill bank account over

---

[1] CUSIP stands for "Committee on Uniform Securities Identification Procedures." A CUSIP is a unique number that is used to identify a specific security.

8

which he and Katzen shared signatory authority. However, in April 2013, at Speight's direction, IST mailed a letter to investors who purchased the fake Altmark bonds informing them that the company (not IST or Speight who had been funding the "interest" payments using other investor monies) was suspending all interest payments going forward. Speight and IST made no further "interest" payments thereafter.

### Katzen Assisted Speight and IST's Early Efforts to Monetize the "Real" Altmark Bonds

31. In early 2011, before commencing the offering of sham Altmark bonds, Speight first explored ways to monetize "real" Altmark bonds that Speight told Katzen he owned or controlled – either by obtaining cash loans collateralized by the bonds, or lending them for a cash fee to financial institutions to be used to satisfy their own regulatory capital requirements. In early 2011, Speight sought to engage in a potential transaction with a large multi-national banking institution located in Singapore, which contemplated lending Speight's "real" Altmark bonds to the bank in exchange for a series of interest payments. However, the bonds were not marketable, as there was no reported trading activity in the securities and therefore no current market pricing was available. Speight believed that assigning a market value to the Altmark bonds was essential to closing the deal with the bank.

32. Speight thought that he could obtain a market value for the bonds by entering into pre-arranged trades in the bonds – *i.e.* trades where the brokers and others colluding with them were on both sides of the transactions – on the German securities exchange where they were listed, and having the trades' artificial pricing quoted on Bloomberg.

33. Speight conscripted Katzen to facilitate getting Bloomberg to quote the prices of these Altmark bond trades. Katzen successfully got the trades quoted.

34. Katzen secured the Bloomberg postings by providing Bloomberg representatives

9

with erroneous information, which Speight provided to Katzen, about key aspects of the bonds, such as that the issuer was actively paying the specified coupon on its bonds, when Altmark was in fact not paying coupon or principal and had perpetually deferred its obligations under the bonds.

35. On occasion, Katzen also lent his assistance by intervening with Bloomberg representatives when the bid and ask prices arising from the prearranged trades were not being quoted on Bloomberg. For example, on September 6, 2011, Katzen sent Speight an email informing him: "I just checked Bloomberg and some old bids are still up on the price side .... I am assuming that means they are expired and old .... Let me know what you need me to do on the Bloomberg end as we get some trades off. I'm thinking we should reach out to [Speight's Bloomberg representative in Germany] first to confirm he is settling instructions, and then reaching to my contact in Bloomberg Corp to make sure it is being accurately reflected." To which Speight replied, "Once I speak with [Altmark's market-maker] and get an idea of when and what we are doing as far as trades go – we will need to be on top of it." Three days later, observing how "[b]id sizes on the 3 lots have now increased to B / A : 200 x 1200, but no trades have posted yet," Katzen proposed, "I think we'll have to wait for trades to post on the exchange and be booked . . . before they post onto Bloomberg. Maybe a call into [Speight's Bloomberg representative in Germany] before he leaves for the end of the day might be beneficial...."

36. Although the prearranged trading scheme ultimately failed to assist Speight in monetizing his Altmark bonds, Katzen's role in getting the bonds and the prearranged trade prices posted on Bloomberg significantly contributed to the subsequent Altmark boiler room scheme in 2012. Most notably, when Speight transitioned to selling sham versions of the Altmark bonds, having what appeared to be current pricing and trades quoted on Bloomberg

provided a basis for prospective investors to believe that the bonds had value and could be traded into a ready and liquid market.

### Katzen Prepared Altmark Offering Materials Containing Materially False and Misleading Information

37. In 2012, after failing to monetize his "real" Altmark bonds, Speight and IST, with Katzen's assistance, resorted to a scheme to create and offer fake versions of the Altmark bonds to the unwary investing public.

38. To support the scheme's sales efforts, at Speight's direction, Katzen created materials for the boiler room Cold Callers to utilize when offering the bonds to the public. Specifically, he prepared offering materials that purportedly described Altmark and the basic terms of the debt securities. The offering materials included numerous materially false and misleading statements in the offering materials that obscured the fact that the "real" Altmark had nothing to do with the sham securities being offered. Among other things, the offering materials represented that:

    a. Altmark <u>itself</u> was issuing and offering its corporate bonds, and as such, "proceeds from the current sale of the Notes … will be used by the <u>Issuer</u>" to fund an array of projects "at the discretion of the Issuer." (Emphasis added). Proceeds raised from the offering were to be used by Altmark for a range of corporate projects including "extraction of oil," "mining," and "real estate development;"

    b. Over the life of the bonds, <u>Altmark</u> would not only repay the investors' principal, but also make periodic interest payments to the investors calculated at a rate of 14% or 12.5% per annum (depending on the specific bond issue). Interest payments would be made on dates determined "at the discretion of the Issuer;"

11

   c. Under a section entitled "Benefits from Investing in Corporate Bonds," the offering materials touted "Safety / Capital Preservation" as a benefit of investing in the Altmark bonds, "because a bond <u>issuer</u> must pay face value at maturity" making investors "more likely to recoup [their] original investment at a specific day in the future, compared to stocks, which have no maturities or guaranteed return of principal." (Emphasis added). Likewise, the offering materials assured investors of "a steady stream of cash income" and "an element of predictability" from the <u>issuer</u>, Altmark, making "regularly scheduled interest payments;"

   d. "Capital Appreciation" and the potential to "Reduce Portfolio Risk" were listed in the offering materials as additional reasons to invest in the Altmark bonds. The offering materials also stated that, due to their ability to be traded on the secondary market, the Altmark bonds could "help reduce the level of risk in an investment portfolio" and yet offer the opportunity to "be sold for a price higher than what was paid originally to acquire them." A Bloomberg screenshot included in the pitchbooks showed bid and ask prices for "real" Altmark bonds above par, based on the prearranged trading on the German exchange;

   e. The offering materials identified an array of "Service Providers" purportedly retained by Altmark in connection with the bond offerings, including: Dunhill as "Investment Advisor," IST as "Trustee & Pay Agent," and Schmidt as "Bond & Tax Counsel." Term sheets for the various bond issuances specified that payments of principal and interest would be made through IST as Altmark's "Paying Agent," and provided a Belize address as the "Registered Address" for Altmark; and

   f. Under a section entitled "Investment Strategy," the offering materials stated that Altmark, under advisement by its investment adviser, Dunhill, had entered into an investment contract with "a Swiss Based Hedge Fund to provide sufficient liquidity in order to

12

provide monthly coupon payments" owed by Altmark on the bonds.

39. As Katzen at least recklessly disregarded, these representations in the offering materials were materially false and misleading. In reality: (a) Altmark never authorized the public offer and sale of its bonds through IST; rather, a shell entity formed by Speight in Belize and bearing the same name as Altmark, posed as the issuer in perpetuating the sham offerings; (b) none of the offering proceeds were transmitted to Altmark and were, instead, misappropriated by the scheme participants, including the outsized commissions paid to the Cold Callers; (c) Altmark would not pay any interest or principal to duped investors and never entered into an investment contract with any investment fund to finance the interest payments owed on the bonds - to the contrary, IST paid fake "coupon" payments to investors funded exclusively by other investors' monies raised from the fraudulent offerings; (d) there was no potential for "capital appreciation" based on a rise in market price because the bonds actually being offered were fake, the market for the "real" Altmark bonds was highly illiquid, and the bid/ask prices quoted on Bloomberg were based on prearranged trades; and (e) IST, Dunhill, Schmidt, and Flom were not retained by the "real" Altmark in connection with the bond offerings, but rather, their sole purpose was to facilitate the scheme and to create the aura of legitimacy necessary to sell counterfeit versions of the bonds to investors.

40. In 2013, when investors in the sham Altmark bonds complained directly to Katzen via email about unpaid interest and their inability to contact the Cold Callers, Katzen forwarded those complaints onto Speight without directly responding to the investors' concerns.

### Katzen Prepared PDL Offering Materials Containing Materially False and Misleading Information

41.     Speight and IST also fraudulently offered and sold stock certificates purportedly issued by a Belize pay day loan company called "PDL Portfolio (XIX) Ltd." ("PDL").

42.     From June 2012 through October 2012, IST received at least $187,000 in investor funds in connection with the offer and sale of shares of fake PDL common stock.

43.     PDL is a corporate shell, not a real business entity. PDL never had any legitimate business operations, income producing assets, or employees.

44.     Speight signed the stock certificates as President of PDL, although he is not an officer or director of the company, since PDL has no officers or directors.

45.     As with IST's Altmark certificates, the PDL certificates were worthless. They contain an "ID No.," but no CUSIP; the certificates purport to be common stock certificates, but the offering materials inconsistently represent that the PDL "shares" will receive principal and a fixed interest rate of 20%; and the offering materials contain multiple references to "Notes" rather than shares. The offering materials also represent that PDL had registered a global note in the name of a nominee with DTC, but, contrary to the representations in the offering materials, no such PDL note is held by DTC.

46.     Katzen prepared PDL offering materials that he at least recklessly disregarded contained this contradictory, false, and misleading information.

47.     At the time, Katzen knew that PDL, at Speight's direction, was only recently incorporated as a shell entity in the off-shore jurisdiction of Belize.

48.     Given PDL's new status as a company, the offering materials' representations about a fully staffed and operational pay day loan business "in both the Domestic and International markets" – including "proprietary systems" with "full front and back end operations

14

currently in place to handle unlimited pay day loan type transactions" and partnerships with leading companies through which PDL offers "complete turnkey solutions" – could not possibly have been in place at the time Katzen prepared those claims.

49. As with the sham Altmark scheme, in the offering materials Katzen listed the same array of fictional "Service Providers" – including Schmidt, IST, and Dunhill – as those identified in the fraudulent Altmark offering materials.

### Misuse of Investors' Monies

50. Once a person agreed to make an investment in Altmark or PDL securities, the Cold Callers instructed them to wire funds to attorney escrow accounts maintained by Schmidt or Flom. Unbeknownst to the investors, Schmidt and Flom transmitted all investor monies that came into their accounts (except for their own fees and bank charges) to IST, rather than to the purported issuers.

51. Katzen monitored these movements of investor funds to Schmidt and Flom's accounts, and their subsequent transfer of corresponding amounts (minus fees) to IST's account. Katzen observed and recklessly disregarded that Schmidt often broke up funds received from investors into a series of smaller dollar amount wire transfers to IST, and that likewise Flom held onto investor funds for a period of time after the funds were received in his account before wiring them to IST's account.

52. To document these fund transfers, Katzen created an internal IST spreadsheet (the "Altmark Spreadsheet") that recorded IST's receipt of investor funds in connection with the offer and sale of Altmark and PDL securities. This spreadsheet shows IST received approximately $3.2 million from approximately 60 investors who purchased sham Altmark and PDL securities over approximately a one year time period.

53. IST did not remit any investor proceeds to the issuers, and instead, misappropriated the funds.

54. Some investor monies were also funneled from IST to a Dunhill bank account. Katzen and Speight shared signatory authority over Dunhill's bank account.

### Sham Altmark and PDL Certificates and "Interest" Sent to Investors

55. IST paid investors approximately $94,000 in supposed "interest payments" from the IST account and from the Dunhill account, into which IST had earlier transferred some investor money that had been received from Schmidt and Flom.

56. Neither the IST account nor the Dunhill account received any monies from Altmark or PDL with which to pay interest.

57. Instead, the "interest payments" made to investors by IST and Dunhill were funded by new incoming investor monies that IST received from the two attorney accounts.

58. As the schemes' ongoing success hinged on IST delivering timely interest payments, Katzen, at Speight's direction, kept track of the interest owed to investors. For example, in an email sent in May 2012, Katzen exhorted Flom to provide investor names because "[w]e are waiting to issue certs based on the confirmation and also need to send the coupon payment. To reiterate – this is extremely URGENT at this point since this is the first coupon payment for each client." Following up in June 2012, Katzen provided Speight with a chart of the interest amount owed to each investor and whether the investor had been paid, as well as "Client Profile" forms tailored to individual investors indicating his or her principal investment and the investor's preference on how coupon payments should be made (via wire or check).

59. Katzen recorded in the Altmark Spreadsheet calculations of annual and monthly

interest to be paid to each investor, and whether IST actually made an initial "interest payment" to those investors.

60. In addition, Katzen used the Altmark Spreadsheet to track IST's issuance of the sham paper certificates which IST mailed to investors while purporting to act as the issuers' transfer agent.

61. When Katzen undertook these efforts, he recklessly disregarded that the offer and sale of Altmark and PDL securities were fraudulent, and accordingly, any bond or stock certificates issued by IST or "interest" paid to investors was not consistent with the sale of legitimate securities.

## FIRST CLAIM FOR RELIEF
(Violations of Sections 17(a) of the Securities Act)

62. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

63. Defendant, directly or indirectly, singly or in concert, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, acting with the requisite state of mind, (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

64. By engaging in the conduct described above, Defendant has violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

65. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

66. Defendant, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

67. By reason of the foregoing, Defendant has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 140.10b-5, promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter final judgments against the Defendant granting the following relief:

### I.

Permanently, restraining and enjoining Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with him, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15

18

U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.

Ordering Defendant to disgorge ill-gotten gains, plus prejudgment interest, and such other and further amount as the Court may find appropriate.

## III.

Ordering Defendant to pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

Permanently barring Defendant from participating in an offering of penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78s(d)(6).

## V.

Permanently barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

## VI.

Such other and further relief as to this Court deems just and proper.

Dated: New York, New York
November 29, 2016

By: _____
Andrew M. Calamari
Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0178

Of Counsel:
Lara S. Mehraban
Alexander Vasilescu
Adam S. Grace
Brenda Wai Ming Chang
John Lehmann

20